UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

```
PATHFINDERS MOTORCYCLE CLUB,    :
Individually and WILLIAM        :
DIFRANCESCO, on behalf of       :
himself and all others          :
similarly situated,             :
              Plaintiffs        :
                                :
      v.                        :        File No. 1:05-CV-330
                                :
SHEILA A. PRUE, WINDHAM COUNTY  :
SHERIFF'S DEPARTMENT, SHERWOOD  :
LAKE, RONALD LAKE, LADD WILBUR, :
DANA SHEPARD, HARRY CULP,       :
MARK GARWIN, JOE DOE, TOWN OF   :
JAMAICA, TOWN OF JAMAICA        :
SELECT BOARD, BEN WILLIAMS,     :
BRUCE CHAPIN, JOEL BECKWITH,    :
JOE GRANNIS, DAVID HAMILTON     :
              Defendants        :
_____ :
```

RULING ON THE SHERIFF'S DEPARTMENT DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
(Paper 15)

Relying on 42 U.S.C. § 1983, as well as other federal and state laws, the plaintiffs have filed this action, alleging, inter alia, the defendants violated their civil rights on August 8, 2004, when they unlawfully interfered with their plan to hold a motorcycle event scheduled to take place in part on Class 4 public roads and trails going through Jamaica, Vermont.  See generally Complaint (Paper 1) at 1-2.

Defendants Sheila A. Prue, the Windham County Sheriff's Department, Sherwood Lake, Ronald Lake, Ladd Wilbur, Dana

1

Shepard, Harry Culp, Mark Garwin and Joe Borgatti (Joe "Doe" in the Complaint caption) (hereinafter collectively referred to as "the Sheriff's Department Defendants") have moved for summary judgment pursuant to Fed. R. Civ. P. 56.  For the reasons set forth below, the Sheriff's Department Defendants' Motion for Summary Judgment is DENIED.

I.   Background

     A.   Summary Judgment Standard

     Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See, e.g., Atlantic Mut. Ins. Co. v. CSX Lines, LLC, 432 F.3d 428, 433 (2d Cir. 2005).  The burden is on the moving party to demonstrate there is no material fact genuinely in dispute.  See Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004).

     Stated another way, the Court's role when considering a motion for summary judgment is to determine whether, in light of the applicable law, there are genuine, unresolved issues of material fact to be tried.  See, e.g., Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).  Only disputes over material facts which might affect the outcome of the suit under

2

the governing law preclude the entry of summary judgment.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

When ruling on a motion for summary judgment, the Court must view the facts and draw all inferences in the light most favorable to the nonmoving party.  <u>See</u> <u>Johnson v. Wright</u>, 412 F.3d 398, 403 (2d Cir. 2005).  At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of fact for trial."  <u>Globecon Group, LLC v. Hartford Ins. Co.</u>, 434 F.3d 165, 170 (2d Cir. 2006) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249).  Thus, the nonmoving party may survive the motion if it responds with specific facts raising a triable issue, and it is able to demonstrate sufficient evidence to support a <u>prima facie</u> case.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 24 (1986).

B.  <u>Factual Allegations</u>

In light of the aforementioned summary judgment standard, and for the purpose of deciding this motion, the Court sets forth the following facts.

Pathfinders Motorcycle Club (hereinafter "Pathfinders") is a Connecticut-based organization of off-road motorcycle enthusiasts.  With over 70 members, Pathfinders is affiliated with the American Motorcyclist Association (hereinafter "AMA") and the New England Trail Riders Association (hereinafter

3

"NETRA").   (Paper 1 at ¶ 5.)   Plaintiff William DiFrancesco is
Pathfinders' Vice President.   (Paper 1 at ¶ 7.)

Pathfinders occasionally sponsors recreational events,
including motorcycle trail rides, off-road trail maintenance,
camping, and an annual banquet.   These events are open to
Pathfinder members, as well as members of AMA and NETRA.   (Paper
1 at ¶ 6.)

One such event, scheduled to take place on August 8, 2004,
was the "2004 Red Fox Turkey Run" (hereinafter referred to as
"the 2004 Run" or "the Run").   To those who participate in
motorcycle and dirt-bike events, designating an outing as a
"turkey run" means the event is purely recreational, not
competitive.

As explained by one registered participant, a "turkey run"
is "basically . . . an organized trail ride.   It's not a race.
It's usually through a couple of towns through the woods. . . .
[S]ometimes you have to use the road section, which is why the
bikes have to be registered.   But it's basically just an
organized, fun ride."   Interview of David Emswiler (appended to
Paper 29 as Ex. 5) at 3.   This description is echoed by another,
who explains "a Turkey Run . . . is completely non-competitive,
non-timed.   There is no timekeeping element whatsoever.   The
objective is not to go fast, and not to go at the proper speed.
It's just to ride the route and have fun."   Deposition of William

Thebert (appended to Paper 29 as Ex. 6) at 4; accord Deposition
of Mark Leipert (appended to Paper 29 as Ex. 3) at 17 (everyone
completing the Run "gets a little pin").

Since the summer of 2000, Pathfinders have held an annual
"Red Fox Turkey Run" in or around Windham County, Vermont.  See
(Paper 1 at ¶ 27.)  Commencing at the Townshend Lake Dam Basin in
Townshend, Vermont, the 2004 Run mapped a route of approximately
109 miles over Class 4 public roads and trails in Windham County,
including the town of Jamaica, Vermont.  It had a rider entry fee
of $35 which defrayed the overhead costs of event promotion,
printing trail maps, and catering lunch.  The Run was limited to
300 registered participants, each of whom was responsible for his
or her own associated costs, including transportation, lodging,
and vehicle preparation.  See Paper 1 at ¶¶ 29-31.

Defendant Town of Jamaica Select Board is the policy-setting
body for the Town of Jamaica.  (Paper 1 at ¶ 18.)  At all times
relevant, defendants Ben Williams, Bruce Chapin, Joel Beckwith,
Joe Grannis, and David Hamilton were members of the Jamaica
Select Board (collectively referred to as the "Jamaica
Defendants").  (Paper 1 at ¶¶ 19-23.)  In past years,
Pathfinders' events had utilized certain Class 4 roadways in
Jamaica, and the Jamaica Defendants had learned the 2004 Run
likewise was scheduled to begin at the Townshend Dam Recreation
Area and proceed on its route via Class 4 roads in Jamaica.    In

5

fact, part of the route was scheduled to pass the property of one of the Select Board members, Ben Williams.  (Paper 1 at ¶ 33.)

Apparently designed, in part, as an attempt to prohibit the Run from utilizing public Class 4 roads in Jamaica, the Select Board, at its June 28, 2004 meeting, proposed an ordinance to close all Jamaica Class 4 roads to motorized vehicles like those ridden by individuals who participate in Pathfinders events. Then Windham County Sheriff Sheila Prue, as well as the Jamaica Defendants, were present at that meeting.  See June 28, 2004 Select Board Minutes (appended to Paper 29 as Ex. 8).  In relevant part, the June 28, 2004 minutes note:

> 6. Sheriff's Department.  The Board thanked Sheriff Sheila Prue for attending the meeting. . . .
>
> Ben Williams reported to Sheriff Prue that a couple of complaints to the Sheriff's Department had not been pursued.  One involved an ATV on Turkey Mountain Road. He called and had been told there was no state ruling against such use, but Williams discovered that was not the case.  Similarly, they had been told there was nothing that could be done about the annual motorcycle rally. . . .
>
> About the motorcycle rally, Bruce Chapin asked if the Sheriff's Department has given permission even though they use public land.  They have not.  Charlie Peck said the annual rally goes up Turkey Mountain Rd., including Class 3 and Class 4 roads.  When he asked members of the motorcycle group if they had permission to put up directional signs for their rally, they said yes, though it was not the case.  Sheriff Prue said she would follow up on any report in this matter.
>
> Charlie Peck raised an issue about how to enforce any regulation vis a vis the Class 4 roads.  If they were closed to vehicular traffic and then used, a criminal complaint could be filed, and the person fined.

Alternatively, if a town ordinance was recorded in the Sheriff's Department and a complaint received, they would issue a ticket, with some money returned.  Ms. Prue said the second plan would be preferable.  An ordinance requires a public hearing.

Charlie Peck, in response to Bruce Chapin's idea that the Board define use, said a blanket prohibition except for written exceptions would be clearer. (Snowmobiles when used with snow on frozen roads would be allowed.)

The Board discussed the signage and decided that signs would be needed at the entrance of all Class 4 roads. Persons who live on such roads would be given written permission for themselves and their guests.  Notice can be sent with tax bills.  Violators would be ticketed.

A motion was made, seconded, and approved, to apply to all Class 4 Roads, with signs to read:

**Road Closed
By Order of Jamaica Select Board,**

**Use or operation of any type of motorized vehicle within the right-of-way limits of this Town of Jamaica Class 4 highway is prohibited at all times, unless a written permit has first been issued by the Jamaica Select Board.  This prohibition shall not apply to snowmobiles using this right-of-way when the ground is frozen and snowcovered.  Any person found in violation of this road closure order will be prosecuted.**

June 28, 2004 Minutes at 2-3 (emphasis in original).

On July 26, 2004, the Select Board once again addressed restricting the use of Town Class 4 roads.  Although the Jamaica Defendants were at that meeting, the record does not reflect the attendance of any Sheriff's Department Defendant.  <u>See</u> July 26, 2004 Select Board Minutes (appended to Paper 29 as Ex. 11).  The Select Board approved the following:

**TOWN OF JAMAICA**
**CLASS IV ROAD and TRAIL ORDINANCE**

**Section 1. Authority.**  This is a civil ordinance adopted under the authority of 24 V.S.A. sections 1971 and 2291(14), and 19 V.S.A. section 304(5).

**Section 2. Purpose.**  The purpose of this ordinance is to regulate the use of motorized vehicles on Town of Jamaica Class IV town roads and legal town trails in order to prevent damage, including, but not limited to, soil erosion and environmental damage, caused by such use, and to ensure that if damage results from a permitted use of such roads or trails, the person responsible for causing the damage will be required to repair such damage at his or her own expense.

**Section 3. Definitions.**  For purposes of this ordinance, the following definitions shall apply:

a. "Motor Vehicle" shall mean all vehicles propelled or drawn by power other than muscular power, except snowmobiles operated when the ground is frozen and snow covered, municipal vehicles and equipment, vehicles in use by fire or rescue personnel engaged in an actual fire or rescue response, and vehicles in use by law enforcement officers engaged in the performance of their duties.

b. "Operate", "operated" and "operating" as applied to motor vehicles shall include "drive," "driving" and "driven" and shall also include an attempt to operate, and shall be construed to cover all matters and things connected with the presence and use of motor vehicles, whether they are in motion or at rest.

c. "Owner" shall include any person, corporation, co-partnership or association holding legal title to a motor vehicle, or having exclusive right to the use or control thereof.

**Section 4. Activity prohibited.**  The operation of a motor vehicle on any Town of Jamaica Class IV Town Highway or Legal Town Trail is prohibited unless the operator has a valid permit issued by the Jamaica Selectboard, and is operating the vehicle in compliance with the terms and conditions of such permit.

**Section 5. Permits.**

a. Permits will be issued only to residents or persons owning property adjacent to or accessed by a Class IV Town Highway or Legal Town Trail or to persons who, in the judgment of the Jamaica Selectboard, have been found to have a legitimate need to operate a motor vehicle on such highway or trail.

b. When granting such permit, the Selectboard may attach such conditions as it shall deem necessary to prevent damage and to ensure that if damage does occur, it is adequately repaired at the permit holder's expense.  Such conditions may include, but are not limited to, requiring the posting of a performance bond, or requiring proof of insurance coverage.

c. The only acceptable permit shall be one entitled "TOWN OF JAMAICA PERMIT TO OPERATE A MOTOR VEHICLE ON CLASS IV HIGHWAY" and signed by the majority of members of the Jamaica Selectboard or their duly authorized agent.  One copy of the permit shall be issued to the permittee, and one copy shall be filed with the Jamaica Town Clerk.

**Section 6. Penalties.**  Any person who operates a motor vehicle on any Town of Jamaica Class IV Town Highway or Legal Town Trail, or who allows another person to so operate, without a valid permit shall be fined $50.00, with a waiver fee of $35.00.  If the owner and operator of a vehicle being driven without a permit are not the same person, the owner and the operator shall each be liable for the fine of $50.00, or the waiver fee of $35.00.

If the holder of a permit under provisions of this ordinance is found by the Jamaica Selectboard to be in violation of any of the terms and conditions of such permit, the permit may be revoked by the Selectboard, and the permit holder may be required to adequately repair, or cause to be repaired, any damage caused by such violation of permit terms and conditions.

**Section 7. Enforcement Officers.**  Enforcement of this ordinance shall be performed by the Jamaica Town Constable or by any officer of the Windham County Sheriff's Department or by any other Vermont law enforcement officer. . . .

9

Ordinance (appended to Paper 29 as Ex. 10).

Significantly, the following exchange is reflected as occurring immediately prior to passage of this Ordinance:

> The language of this proposed Town Ordinance comes from the Vermont League of Cities and Towns, researched by Charlie Peck.  Heretofore, Jamaica had a Class IV Roads policy, but not an enforceable ordinance.
>
> Mr. Chapin asked the Board members, "Does anyone have any questions?  It looks good to me and simple."  Mr. Beckwith remarked, "It has no teeth unless we put up Class IV Road signs."  Mr. Williams explained, *"We will need to give prior warning by advertising in the newspaper and posting legal notices in five places, as required, before this could be generally enforceable. And then we could deliver it to the Sheriff's Department for enforcement."*  Mr. Grannis moved that "We adopt this Class IV Road and Trail Ordinance and advertise it, *so that it will become effective in 60 days,* unless a petition is filed calling for disapproval of this ordinance, signed by five percent or more of the legal voters of Jamaica."

July 26, 2004 Select Board Minutes at ¶ 10 (emphasis added).

Despite the suggestion that the newly-passed ordinance was unenforceable for the purpose of stopping the 2004 Run, the Windham County Sheriff's Department, as urged by certain Jamaica Defendants, commenced a campaign to stop the Run participants from using Jamaica's Class IV roads as planned.  Vermont Fish and Wildlife Warden Kelly Price, who was present at the Townsend Lake meeting area the morning of the Run, noted, when talking with one of the Sheriff's Department Defendants, he "was told that they (the Sheriff's office) had been instructed by the Sheriff herself to stop the race because the event coordinator did not get the

10

proper permits from the towns they would be riding through . . .
." Price Letter to Det. Howell (appended to Paper 29 as Ex. 12);
accord Report of Interview (appended to Paper 29 as Ex. 13).

In addition, Defendant Ben Williams has testified that,
while "not sure" that it was an enforceable ordinance on the date
it was passed, Jamaica officials put

> pressure . . . on the Sheriff's Department to do
> something, and if something means that it [the Run]
> didn't happen, I guess that's where it went. We did
> not want three hundred motorcycles impacting our town
> roads, and - at least without prior knowledge of what
> was happening. We as a Select Board received several
> complaints from the public we represent, stating that
> these were a nuisance, and they didn't like the noise
> and the dust, and so we felt that our hands were tied
> in - as far as the Select Board goes, what we could do,
> and we looked to the State and to the Sheriff's
> Department. I did call the State Police also that
> morning. They referred me to the Sheriff's Department,
> or back to the Sheriff's Department.

Williams Deposition (appended to Paper 29 as Ex. 8) at 5 and 7.
In fact, "[o]ne of the things that happened in our previous talks
with the Sheriff's Department was that I [Williams] was to
contact the Sheriff, not a deputy, to make sure that the word got
out properly." Williams Deposition at 11. Upon finding some
directional signs the day before the Run, Williams "did call the
[Sheriff's Department] dispatcher here in Newfane, and sent them
[sic] a faxed copy of the ordinance," although he apparently did
not contact Prue directly. Williams Deposition at 12.

The plaintiffs had secured a Special Use Permit which
allowed the Run participants to meet in the Townshend Lake

parking area.  <u>See</u> Red Fox Turkey Run Special Use Permit
(appended to Paper 29 as Ex. 22).  Around 7:00 a.m., on August 8,
2004, defendants Sherwood Lake, Ronald Lake, Ladd Wilbur, Dana
Shepard, Harry Culp, Mark Garwin, and Joe "Doe" Borgatti
proceeded to the Townshend Dam, where the 2004 Run participants
were scheduled to meet and register before commencing their ride.
<u>See</u> Interview of Lt. Sherwood Lake (appended to Paper 29 as Ex.
14) at 10.  According to Lt. Lake, he handed the eight or nine
officers with him copies of Vermont motor vehicle statutes
relating to the riding and operating of motorcycles on roadways,
to make sure they understood the motor vehicle laws they were
going to enforce.  Lake Interview at 11.

        In addition, at some point that morning, defendant Ladd
Wilbur contacted Windham County State's Attorney Dan Davis.  <u>See</u>
Interview of Cpl. Ladd Wilbur (appended to Paper 29 as Ex. 16) at
2.  Ostensibly, the purpose of the call was to determine "whether
[the Run] met the criteria to be a race" as defined under 31
V.S.A. §§ 301 and 303.  Wilbur Interview at 3.

        The record is equivocal as to the precise "information" the
Sheriff's Department Defendants provided or omitted when
conversing with Davis, but the result of the conversation was
that Davis opined the Run constituted a prohibited "rally,"
"race" or "scramble." Davis "could not recall specifically at
this time what the facts were but he does remember that based

                                 12

upon what he was told by the Deputy and after review of the statute, he advised the Deputy that it would meet the criteria for a race." Significantly, however, Davis advised Wilbur "that if the race went off and started as described, they would be able to charge the promoter present only with a violation of the section under Vermont law." See Attorney General's Report of Interview of Dan Davis (appended to Paper 29 as Ex. 17).

The plaintiffs maintain the Sheriff's Department Defendants knew that merely citing the promoter would not shut down the Run; therefore, several defendants took other steps designed to halt the event. The record contains suggestions that, at the Townshend Lake Dam meeting site, several Sheriff's Department Defendants confronted the Run registrants with a variety of questionably legal threats. See, e.g., Findings and Conclusions of the Vermont Attorney General (appended to Paper 29 as Ex. 1) at 4 ("Apparently, statements were made to some participants about possible violations and consequences that simply do not exist under Vermont law."). As succinctly recounted in the Vermont Attorney General's December 1, 2004 Report on this incident:

> According to a number of participants, they were told
> by the WCSD [Windham County Sheriff's Department] that:
> they needed Department of Transportation (DOT) approved
> tires; they needed DOT approved goggles; they needed
> DOT approved helmets; they needed directional signals
> on their motorcycles; their license plates must be
> visible from a distance of 500 feet; each participant
> needed to carry written permission from each private

property owner with him during the event; if they were
issued a ticket their motorcycles could be impounded
and held until a court hearing, or sold at auction; and
finally, that this event was a "race" under Vermont
law, without a required permit, and if participants
rode in it then event organizers would be arrested.

Paper 29, Ex. 1 at 4; accord Interview of John Przybylski
(appended to Paper 32 as Ex. 4) at 5 (he was told that
"roadblocks" would be put up and motorcycles "impounded" if
anyone tried to ride in the event); William Leipert Deposition
(appended to Paper 29 as Ex. 18) at 23 ("They said if we rode,
they'd find a . . . reason to give me a ticket . . . impound my
motorcycle . . . to auction it off."); William Thebert Deposition
(appended to Paper 29 as Ex. 6) at 10-11 ("He asked whether my
goggles were DOT approved" and had "a DOT approved imprint.");
Interview of Sgt. Ronald Lake (appended to Paper 29 as Ex. 15) at
7 ("They were told that the event-if it kicked off, the
organizers would be arrested.").

Upon learning of the Jamaica Defendant's Ordinance, the
plaintiffs voluntarily rerouted the 2004 Run around the Town of
Jamaica.  See Mark Leipert Deposition (appended to Paper 29 as
Ex. 3) at 4; 2004 Red Fox Trail Map (appended to Paper 29 as part
of Ex. 24).  Apparently not satisfied with the event avoiding
Jamaica, the Sheriff's Department Defendants continued to
intimidate the gathering group of participants.  See, e.g.,
Leipert Deposition at 6-7 (describing Lt. Lake's arrival at
Townshend Dam registration with "lights going" and his statement

"don't bother unloading your bikes . . . I'm here to shut your
event down . . ."). It appears, for example, that certain
Sheriff's Department Defendants fabricated "safety violations" to
discourage registering participants from proceeding to ride the
new route.  See, e.g., Leipert Deposition at 10 (when confronted
with the assertion that a bike was legally registered in another
state, Lake "said, I will find a way to give you a ticket somehow
. . . and then you can come fight the ticket if you'd like").  As
a result, the participants peacefully left, and the 2004 Run was
cancelled.

Based on a number of subsequent complaints, the Vermont
Attorney General's Office conducted an investigation of the
incident and issued a report dated December 1, 2004.  See
generally Paper 29 at Ex. 1.  Among its conclusions were: (1) The
event was not a "race" and the Sheriff's Department Defendants
were "incorrect both in saying it was and in using that as a
basis to threaten to 'arrest' the event organizers if it took
place"; (2) "The Jamaica Town Ordinance was not validly enacted
because it lacked the approval of the Secretary of
Transportation, and was also unenforceable on the date of the
event because of the required 60-day waiting period"; (3) the
Sheriff's Department Defendants' knowledge of applicable motor
vehicle laws was "seriously lacking"; and (4) in spite of the
defendants' actions, the Run's participants "conducted themselves

in an exemplary manner, without any disorderly behavior, and disbursed peacefully."  Paper 29, Ex. 1 at 5.

II.  Discussion

    A.  Qualified Immunity

    The Sheriff's Department Defendants argue application of the doctrine of qualified immunity entitles them to summary judgment. See generally Paper 15-1.  According to the Supreme Court, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged."  Saucier v. Katz, 533 U.S. 194, 200 (2001).  "[I]f the analysis focuses on whether an officer made a reasonable mistake of fact that justified his conduct, what is examined is whether there was a constitutional violation, not whether the officer is entitled to qualified immunity."  Cowan v. Breen, 352 F.3d 756, 762 (2d Cir. 2003). Thus, if an officer reasonably, but mistakenly, believed his actions were justified, no violation of a constitutional right has occurred.  See Saucier, 533 U.S. at 205.

    Second, assuming the violation of a constitutional right, the Court must consider whether the officers are nevertheless entitled to qualified immunity.  Id. at 202.  The conduct of the officers is "evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."  Id. at 206.

16

The qualified immunity inquiry, on the other hand, has
a further dimension.  The concern of the immunity is to
acknowledge that reasonable mistakes can be made as to
the legal constraints on particular police conduct.  It
is sometimes difficult for an officer to determine how
the relevant legal doctrine . . . will apply to the
factual situation the officer confronts.  An officer
might correctly perceive all of the relevant facts but
have a mistaken understanding as to whether a
particular [action] is legal in those circumstances.
If the officer's mistake as to what the law requires is
reasonable, however, the officer is entitled to the
immunity defense.

Id.

 B. Did a Constitutional Violation Occur?

 The Court must first determine whether the plaintiffs allege

sufficient facts to show a violation of a right secured either by

the Constitution or a federal statute.  See, e.g., Poe v.

Leonard, 282 F.3d 123, 133 (2d Cir. 2002).  The plaintiffs allege

the Sheriff's Department Defendants violated a number of their

constitutional rights, including "their rights to freedom of

speech, to peaceably assemble, to equal protection of the law, to

due process, their right to travel and their rights to be free

from unreasonable search and seizure, false arrest, unreasonable

arrest, unreasonable detention and malicious prosecution . . . ."

(Paper 1 at ¶ 86.)

 Based on the current record, and without deciding the merits

of the plaintiffs' remaining claims, including their Fourth and

Fourteenth Amendment allegations, the Court finds the actions of

the Sheriff's Department Defendants implicate violations of the

plaintiffs' constitutional rights to assemble, associate, and travel on or otherwise use the public areas, trails and roadways in Vermont.

Here, the First Amendment arguably provides one protected right which the Sheriffs' Department Defendants infringed.  See U.S. v. Rubio, 727 F.2d 786, 791 (9th Cir. 1984) ("We agree with defendants that the First Amendment protects their right to associate with one another and with the Hell's Angels Motorcycle Club."); accord LoFranco v. U.S. Parole Commission, 986 F. Supp. 796, 804 (S.D.N.Y. 1997), aff'd, 175 F.3d 1008 (2d Cir. 1999). The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, education, religious, and cultural ends."  Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984).  This right encompasses the plaintiffs' right to conduct a properly permitted event like the 2004 Run over roads and trails accessible to the public.

Likewise, the facts alleged by the plaintiffs suggest the violation of the type of constitutional "right to travel" which courts have recognized.  It is well-established that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law . . . ."  Kent v. Dulles,

357 U.S. 116, 125 (1958).  "Freedom of movement is basic in our scheme of values."  Id. at 126.

Accordingly, "the right to intrastate travel, or what we sometimes will refer to as the right to free movement, has been recognized in this Circuit."  Ramos v. Town of Vernon, 331 F.3d 315, 322, rev'd in part on other grounds, 353 F.3d 171 (2d Cir. 2003).  "Though the Supreme Court has dealt only with the right to travel between states, [the Second Circuit] has held that the Constitution also protects the right to travel freely within a single state."  Spencer v. Casavilla, 903 F.2d 171, 174 (2d Cir. 1990).  Logically, this right encompasses the right to ride a motor vehicle on a public road or trail.  See Lutz v. City of York, 899 F.2d 255, 268 (3d Cir. 1990) ("the right to move freely about one's neighborhood or town, even by automobile, is indeed implicit in the concept of ordered liberty . . .") (quotations omitted); King v. New Rochelle Mun. Hous. Auth., 442 F.2d 646, 648 (2d Cir. 1971) ("It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state.").

Viewed in a light most favorable to the plaintiffs, the record indicates the Sheriff's Department Defendants' threats and actions prohibited plaintiffs from congregating at the Townshend Lake Dam and conducting the 2004 Run.  The plaintiffs had planned

19

a motorcycle route proceeding through Vermont public ways, first partially located in Jamaica, and then avoiding the town altogether.  The plaintiffs had secured the proper permit to assemble at Townshend Lake Dam, and the record does not suggest they were required to secure additional permits to use the roads and trails envisioned by the 2004 Run trail map.

The record also indicates both that the Jamaica Ordinance was unenforceable at the time of this incident and that the Sheriff's Department Defendants knew or should have known the Ordinance was unenforceable at the time of the Run.  Furthermore, based upon their training as law enforcement officers and upon the advice of Dan Davis, the Sheriff's Department Defendants knew or should have known their arrest threats were unlawful, their threats to impose sanctions for phantom violations of state motor vehicle laws were unfounded, and that plaintiffs legally could have conducted the Run as originally planned.

It is noteworthy that the plaintiffs voluntarily changed the route to avoid the Town of Jamaica, an accommodation which did not satisfy the Sheriff's Department Defendants, who acted with apparent determination to "shut down" the rerouted Run.  As will be discussed infra, the claim of several defendants that they saw "trophies" or that they reasonably perceived the event to constitute a prohibited "race" is poorly supported and, at a minimum, raises a material factual dispute which prohibits the

20

entry of summary judgment.  Absent any arguable demonstration
that the 2004 Run, either as originally planned or as revised,
posed a threat to public safety or represented a material
violation of applicable laws or procedures, the Sheriff's
Department Defendants, without objectively reasonable
justification, violated the plaintiffs' constitutional rights.
Cf. LCN Enters., Inc. V. City of Ashbury Park, 197 F. Supp. 2d
141, 152 (D.N.J. 2002) (cancellation of motorcycle convention
justifiable "to prevent or control unlawful conduct and thereby
indirectly affects the associational rights of the affected group
. . ."); LoFranco, 986 F. Supp. at 804 (it is permissible to
restrict a parolee's right to associate with motorcycle clubs).

    C.    Are the Sheriff's Department Defendants
          Nevertheless Entitled to Qualified Immunity?

    Having found the violation of a constitutional right, the
Court still must consider whether the Sheriff's Department
Defendants are entitled to assert qualified immunity because "it
was objectively reasonable for [them] to believe at the time of
the challenged action that [their] actions were lawful."  Posr v.
Doherty, 944 F.2d 91, 95 (2d Cir. 1991).  As the Supreme Court
has counseled:

> [O]ur cases establish that the right the official is
> alleged to have violated must have been "clearly
> established" in a more particularized, and hence more
> relevant sense: The contours of the right must be
> sufficiently clear that a reasonable official would
> understand that what he is doing violates that right.
> This is not to say that an official action is protected

by qualified immunity unless the very action in
question has previously been held unlawful . . . but it
is to say that in the light of pre-existing law the
unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations
omitted).

On several occasions, the Second Circuit has stated "a right
is clearly established if (1) the law is defined with reasonable
clarity, (2) the Supreme Court or the Second Circuit has
recognized the right, and (3) a reasonable defendant would have
understood from the existing law that his conduct was unlawful."
Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004) (citations,
internal quotation marks and punctuation omitted).  As discussed
supra, the law concerning the constitutional rights to assembly
and to travel were recognized and reasonably defined in 2004.  A
reasonable law enforcement official in the position of the
Sheriff's Department Defendants would have understood his or her
actions were unlawful.

A major portion of the defendants' argument is grounded in
the assertion that they reasonably perceived the 2004 Run to be a
"race" prohibited under 31 V.S.A. § 301.  On the current record,
the asserted presence of trophies appears to be virtually the
only ground for concluding the Sheriff's Department Defendants
acted with objective reasonableness when they concluded the 2004
Run was actually a prohibited race.

22

"[I]f any reasonable trier of fact could find that the
defendants' actions were objectively unreasonable, then the
defendants are not entitled to summary judgment.  An officer's
actions are objectively unreasonable when no officer of
reasonable competence could have made the same choice in similar
circumstances."  Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir.
1995).

Several defendants suggest they saw "trophies" near the
event's registration area, and that State's Attorney Dan Davis
interpreted their presence as indicating a violation of section
301.  See generally Paper 15 at 20 et seq.  The record, however,
is equivocal on the issue of whether trophies were present, and
if so, whether they had anything to do with the Run.  In
addition, Davis has no recollection of the information related to
him the morning of the Run.  See generally Paper 34-1 at 10 et
seq. (summarizing deposition and affidavit testimony relating to
the morning of the Run).  Furthermore, Dan Davis indicates he
instructed that only event organizers could be issued a citation,
a factor starkly inapposite to the subsequent threats to arrest
someone, or to ticket, tow, and auction off the vehicles of
participants.  See Davis Affidavit (appended to Paper 29 as Ex.
17) ("Davis stated that he told the Deputy [Ladd Wilbur] that if
the race went off and started as described, they would be able to
charge the promoter present only with a violation of the section

23

under Vermont law.  Davis stated that he specifically told the Deputy that they were to issue a citation . . . ").

Accordingly, the record contains no objectively reasonable basis to conclude that an officer of reasonable competence would have concluded that any measure in excess of issuing a citation to the event promoter was lawful, reasonable, or appropriate. The lack of clarity on the important, objective factual issues surrounding the actual presence of trophies, the explanation for their alleged presence, the information supplied the State's Attorney, and the advice he provided, renders entry of summary judgment on "reasonableness" and qualified immunity for these defendants inappropriate.  Cf. Cobb v. Pozzi, 363 F.3d 89, 111-12 (2d Cir. 2004) ("objective reasonableness" is a jury question where "there was enough evidence for the jury, rather than the district court, to decide whether the defendants treated the plaintiffs differently from similarly situated officers and had a rational basis for doing so"); Iacobucci v. Boulter, 193 F.3d 14, 25 (1st Cir. 1999) ("A police officer is not a law unto himself; he cannot give an order that has no colorable legal basis and then arrest a person who defies it."); Diamondstone v. Macaluso, 148 F.3d 113, 126 (2d Cir. 1998) ("Given the traffic court's repeated rulings in Diamondstone's favor, it is hard to see how a reasonable officer in Macaluso's position could have believed his actions to be lawful.").

III. <u>Conclusion</u>

The Sheriff's Department Defendants' Motion for Summary Judgment is DENIED.

<u>On or before June 4, 2007</u>, the parties shall jointly prepare and file a discovery schedule in accordance with Local Rule 26.1(b).  The schedule shall include a date for a second ENE session to be conducted with the Evaluator, Arthur J. O'Dea, in early September 2007.  The Clerk shall provide a copy of this ruling to counsel of record and the Evaluator.

SO ORDERED.

Dated at Brattleboro, Vermont, this 23rd day of May, 2007.


/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge